IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

STEVEN CAMPBELL and
SUSAN CAMPBELL,

       Plaintiffs,

v.             CIVIL ACTION NO. 3:22-0417

UPTOWNER INNS, INC.
d/b/a COCO VIEW RESORT,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Uptowner Inns, Inc.'s Renewed Motion to Dismiss. ECF No. 36. Plaintiffs Steven and Susan Campbell oppose the motion. For the following reason, the Court **GRANTS** Defendant's motion and **DISMISSES** this action.

**I.**
**BACKGROUND**

In their original Complaint, Plaintiffs allege that Uptowner Inns, Inc. ("Uptowner") is a West Virginia corporation that does business as Coco View Resort in Roatan, Honduras. *Compl.* ¶¶IV, IX. Plaintiffs, who are Georgia residents, assert that, on or about September 29, 2020, Mr. Campbell was vacationing at Coco View Resort in Honduras when he went on a diving excursion and was struck by the propeller of boat owned and operated by Defendant. *Compl.* ¶¶III, XI, XIII. Plaintiffs claim that Mr. Campbell suffered "severe and disabling injuries" and Mrs. Campbell suffered a loss of consortium. *Id.* ¶¶XIII, XIV. Plaintiffs also summarily claimed damages for "past, present and future physical pain and suffering, . . . mental and emotional pain and suffering, . . . medical expenses, . . . wages and fringe benefits,

. . . impairment of future earning capacity, . . . loss of enjoyment of life, . . . permanent disability, . . . punitive damages, . . . attorneys' fees, and . . . other elements of damages to be shown at the trial of this matter." *Id.* ¶XVIII.

Plaintiffs further alleged federal jurisdiction exists "pursuant to 28 U.S.C. § 1333 and 28 U.S.C. § 1332." *Id.* ¶I. Other than this single mention of § 1332, which provides this Court with original jurisdiction over "civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States," Plaintiffs made no specific reference to an amount in controversy exceeding $75,000 in their original Complaint. Instead, they seemed to rely most heavily on jurisdiction being based upon General Admiralty and Maritime Law under § 1333. *See Compl.* ¶II (stating Plaintiffs brought their action "pursuant to the Constitution and Laws of the United States of America and the State of West Virginia under the General Admiralty and Maritime Law. Plaintiffs bring this admiralty suit pursuant to the 'Saving to Suitors' clause, 28 U.S.C. § 1333, as well as the laws of the State of West Virginia.").

Given the Plaintiffs' emphasis on § 1333, Defendant moved to dismiss the Complaint, initially arguing that federal maritime jurisdiction does not exist because the claim arose within the territorial waters of Honduras and not on the high seas or navigable waters of the United States. Defendant also argued that, to the extent Plaintiffs have attempted to invoke federal diversity jurisdiction, the Complaint only makes conclusory and unsupported claims of damages that do not satisfy the amount in controversy. Furthermore, Defendant asserted the Complaint should be dismissed for *forum non conveniens*, improper venue, and for failure to

state a claim. With respect to its failure to state a claim argument, Defendant asserted that it is neither the owner nor operator of Coco View Resort. Thus, there is no legal basis to hold it liable.

Perhaps realizing the weakness of maritime jurisdiction, Plaintiffs filed a First Amended Complaint, expressly alleging the amount in controversy exceeds $75,000. *First Am. Compl.* ¶¶ II, V. Plaintiffs also added that Mr. Campbell's "severe and debilitating injuries" include, but are not limited to, his "mind, . . . arms, chest, abdomen, and legs," and he had "surgery and suffers from significant nerve damage as a result of the incident." *Id.* ¶XIV. The First Amended Complaint also retained Mrs. Campbell's loss of consortium claim and the same damages summarily listed at the end of the original Complaint. *Compare id.* ¶XX to *Compl.* ¶XVIII. In addition, Plaintiffs filed a Motion for Jurisdictional Discovery and to Delay Consideration of Defendant's Motion to Dismiss until such discovery is concluded. Plaintiffs specifically requested jurisdictional discovery on where the accident occurred, the relationship between Defendant and Coco View Resort, and *forum non conveniens*.

Following briefing, the Court entered a Memorandum Opinion and Order on March 24, 2023, denying Defendant's Motions to Dismiss without prejudice and granting, in part, Plaintiffs' request for discovery. The Court authorized the parties to engage in limited discovery for a period of ninety days on (1) whether the accident occurred within the jurisdictional waters of Honduras and (2) whether the business relationship between Defendant and Coco View Resort, if any, is sufficient to impose liability. The Court did not permit discovery on *forum non conveniens* as it would involve much broader discovery that ultimately

could be determined to be unnecessary. Following the close of the ninety-day period, Defendant filed the pending Renewed Motion to Dismiss.

## II.
## SUBJECT MATTER JURISDICTION

As an initial matter, Defendant asserts that discovery has demonstrated that the accident occurred within the territorial waters of Honduras. Thus, jurisdiction does not exist under § 1333. Plaintiffs concede this point. Therefore, the Court agrees that it does not have jurisdiction under General Admiralty and Maritime Law, 28 U.S.C. § 1333. Next, Defendant argues the Complaint should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure because Plaintiff has failed demonstrate jurisdiction pursuant § 1332 because the amount in controversy does not exceed the sum or value of $75,000.

With regard to the amount in controversy, a court must look to the Complaint and determine whether a plaintiff has set forth a claim in good faith that meets the amount in controversy requirement. *Wiggins v. N. Am. Equitable Life Assur. Co.*, 644 F.2d 1014, 1016 (4th Cir. 1981) ("Ordinarily the jurisdictional amount is determined by the amount of the plaintiff's original claim, provided that the claim is made in good faith."). Most often, the amount "claimed by the plaintiff controls the amount in controversy determination." *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 638 (4th 2010) (internal quotation marks and citation omitted). "If the plaintiff claims a sum sufficient to satisfy the statutory requirement, a federal court may dismiss only if it is apparent, *to a legal certainty*, that the plaintiff cannot recover the amount claimed." *Id.* (internal quotation marks and citation omitted; italics added in *Frashier*). In those situations, the defendant carries a "heavy burden" to get a case dismissed for not satisfying the jurisdictional amount. To get dismissal, the defendant "must show the legal impossibility of recovery to be so

certain as virtually to negative the plaintiff's good faith in asserting the claim." *Id.* (internal quotation marks and citation omitted). Such a showing may be made

> if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.

*St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938) (footnote omitted).

In support of their respective positions, each side has submitted evidence they believe demonstrates the amount in controversy.[1] For Defendant's part, it relies upon a single medical bill produced by Plaintiff in the amount of $1,533.00 for treatment Mr. Campbell received at the Wood Medical Center in Honduras following the accident. *Bill from the Wood Med. Ctr.*, ECF No. 10-3. The medical report from the facility indicated, in part, that Mr. Campbell had pain with contusions on both thighs that were cleaned, debrided, drained, and sutured. *Med. Report from Wood Med. Ctr.*, at 9, 11, ECF No. 10-1. Mr. Campbell was discharged from the Center with instructions to follow-up with his primary care physician upon his return to the United States. *Id.* at 12. Given the *de minimis* amount Mr. Campbell expended on his medical care, Defendant argues that, even if Plaintiffs are able to recover other damages for such things as pain and suffering, the totality of the damages will fall well short of the jurisdictional threshold.

---

[1] "Generally, when a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004) (citations omitted).

With their Response, Plaintiffs disclosed for the first time medical bills and records from the Vein Center at Johns Creek Surgery, P.C., showing Mr. Campbell underwent five endovenous chemical ablations, at a cost of $16,848.53 per ablation. *See Operative Notes and Health Ins. Claim Forms*, ECF No. 38-5. The first medical record is for an ablation that occurred on March 4, 2022, nearly 18 months after the accident. The medical records show additional ablations on March 11, August 19, August 26, and October 11, 2022.

Defendant asserts, however, there is nothing that connects these procedures to the accident as these treatments were for venus reflux and varicose veins. In the March 4 Operative Note, Mr. Campbell's diagnosis was "[p]ersistent significant venous reflux of the left distal greater saphenous vein," "[b]ilateral Varicose veins," and "abnormal findings on diagnostic imaging." *Operative Note*, at 1 (Mar. 4, 2022), ECF No. 38-5, at 9. The March 11 Operative Note was similar, but involved "[s]ignificant venous reflux of the right patent distal greater saphenous vein/branches and connected varicosities[.]" *Operative Note*, at 1 (Mar. 11, 2022), ECF No. 38-5, at 1. Likewise, the remaining three ablations alternated between the right and left distal greater saphenous vein. *Operative Notes*, at 1 (Aug. 19 and 26 and Oct. 11, 2022), ECF No. 38-5, at 3, 5, 7. The March 4 Operative Note also indicates Mr. Campbell had undergone "previous ablations to the upper-mid calf" and previous Varithena treatments in the leg and the treated area all appeared closed." *Operative Note*, at 1 (Mar. 4, 2022). Additionally, it was written that Mr. Campbell "has very extensive disease in both legs and will need several more sessions to try and attempt closure." *Id.* Similarly, the March 11 Operative Note of the right patent distal greater saphenous vein mentions closure from previous ablation in the thigh, prior Varithena treatments, and extensive disease. *Operative Note*, at 1 (Mar. 11, 2022). Given these

medical records, Defendant essentially contends these procedures were for long-standing treatment of his veins that had nothing to do with the injuries he sustained while diving. Moreover, Defendant contends that the Health Insurance Claim Forms Plaintiffs submitted for each of these procedures conclusively forecloses that any relationship exists between the ablations and the accident as it is marked on those forms that Mr. Campbell's condition is not related to an accident. *See Health Ins. Claim Forms*, at 11-15, ECF No. 38-5.

Upon review, the Court finds Defendant's arguments compelling. Nevertheless, based on the records submitted, the Court is unable to declare on a motion to dismiss that these ablations had nothing to do with Mr. Campbell's accident. Although the medical records provide there were procedures performed prior to March 4, 2022, it is unknown to the Court whether those earlier procedures were done during the eighteen-month window between the date of the accident and March 4. In addition, the Court is reluctant to give undue weight to the Health Insurance Claim Forms without any direct information from the attending physician, whether it be by deposition, affidavit, or otherwise, that the medical treatment Mr. Campbell received was completely unrelated to his injury. This Court simply does not have sufficient information to determine if the lacerations on Mr. Campbell's legs contributed to the problems he has with his veins.

Additionally, Plaintiffs claim in their Response that, upon Mr. Campbell's return to the United States, he was evaluated and treated by a physician and he received wound care and treatment for his nerve damage. *Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss* at 2, ECF No. 38. Plaintiffs further stated Mr. Campbell "has undergone two years of physical therapy and

continues medical treatment for his nerve damage as a result of the incident." *Id.* at 3. Although these medical records and billing statements were not produced with their Response, Plaintiffs assert they are obtaining the physical therapy records and will provide them to Defendant once they are received. *Id.* at 5 n.8.

Given the totality of Plaintiffs' allegations and their request for a broad range of damages, the Court cannot say with any certainty that the amount in controversy does not exceed the $75,000 jurisdictional threshold as expressly alleged in Plaintiffs' First Amended Complaint. Therefore, the Court finds Defendant has failed to show to a *legal certainty* that Plaintiffs shall never be able to recover that amount, and it **DENIES** Defendant's motion to dismiss for lack of subject matter jurisdiction.

### III.
### WHETHER UPTOWNER INN, INC. IS A PROPERLY NAMED DEFENDANT

In the Court's earlier Memorandum Opinion and Order, the Court also permitted the parties to conduct discovery on whether Uptowner Inns, Inc. is a properly named Defendant. In its Renewed Motion to Dismiss, Uptowner asserts that discovery substantiates its claim it neither owns nor operates Coco View Resort and it owed no duty to Plaintiffs for which it can be held liable. Plaintiffs disagree and argue Uptowner can be held liable for their damages.

During discovery, Plaintiffs were given the opportunity to take the deposition of Carl Midkiff as Uptowner's Rule 30(b)(6) witness. Mr. Midkiff stated that a corporation known as CEM Island Investments, Inc. (CEM) is the actual owner of Coco View Resorts. *Dep. of Carl Midkiff,* at 10, ECF No. 36-6. CEM is a Honduras corporation that purchased the stock of Coco

View Resort in the early 2000s. *Id.* at 10-11, 14. Mr. Midkiff explained that CEM was created to acquire Coco View Resort's stock, and CEM is owned by himself, his wife Elizabeth Midkiff, and three trusts for the benefit of his sons Wade, Lewis, and Stacy. *Id.,* at 10-11. Mr. Midkiff stated the resort has no employees in West Virginia. *Id.* at 18-19.

Mr. Midkiff also testified that he is the President of Defendant Uptowner, which is a privately held West Virginia corporation, and his son Wade is the CEO of Uptowner. *Id.* at 5-6, 58. Mr. Midkiff stated that the shareholders of Uptowner include himself, Elizabeth Midkiff, and two trusts for his sons Wade and Lewis Midkiff. *Id*. at 8-9. According to Mr. Midkiff, Uptowner does not own any Coco View Resort stock. *Id.* at 56. Instead, Uptowner owns two Delta hotels in West Virginia and a company called Roatan Travel, which is a Florida corporation and a wholly owned subsidiary of Uptowner.[2] *Id.* at 6, 21, and 24. According to Carl Midkiff, Elizabeth Midkiff is the director of Roatan Travel. *Id.* at 27.

Mr. Midkiff stated that Roatan Travel has office space in West Virginia in a building owned by Uptowner, but he said the two companies do not share the same space within that building. *Id*. at 62-64.[3] Roatan Travel has three employees in its West Virginia office: Pam Miller, a woman named "Kelly,"[4] and another individual who was recently hired, but Mr.

---

[2]Plaintiffs' counsel represented at the deposition that Roatan Travel was dissolved by Florida's Secretary of State for failure to file necessary paperwork. *Id.* at 22. Mr. Midkiff stated that information was untrue and the official records list it as an active corporation. *Id.* at 36.

[3]Mr. Midkiff represented that the two business recently moved locations from a leased space to a building owned by Uptowner. *Id.* at 62. Mr. Midkiff stated that the businesses also did not share the same space in the previous location. *Id.* at 59, 62-64.

[4]Kelly's last name is unknown.

Midkiff does not know his name. *Id.* at 20-24, 26. These employees are paid through Roatan Travel's bank account. *Id.* at 24. Additionally, Mr. Midkiff stated that Roatan Travel has its own credit card processing account, which is separate and distinct from Uptowner's. *Id*. at 49. Although both Uptowner and Roatan Travel use the same accountant, Mr. Midkiff stated he is a consultant and not an employee. *Id*. at 50. He also is not the same accountant used by Coco View Resort. *Id.*

On Coco View Resort's website under the heading "Reservations, Room Availability, & Information" is Roatan Travel's West Virginia phone number. Roatan Travel's employees answer these calls and can make reservations for Coco View Resort. *Id.* at 19-20, 23; *Printout from Coco View Resort's Website*, ECF No. 38-6. Mr. Midkiff stated that Roatan Travel receives the money from prepaid bookings at Coco View Resort that are made in the United States. *Id.* at 46. On the other hand, if a customer pays by a credit card directly at the resort, the money goes directly to a Honduras bank that processes credit cards for the resort. *Id.* at 44. Mr. Midkiff specifically denied that any money paid either in advance or at the resort itself ever goes to Uptowner. *Id.* at 44-46.

During the deposition, Plaintiffs' counsel also showed Mr. Midkiff that on Coco View Resort's website it states that "Credit Card payments will be listed as Proctorville Holiday Inn/Uptowner Inns, Inc. on your statement." *Id.* at 38, 39; *see also Printout from Coco View Resort's Website*, ECF No. 38-7. Mr. Midkiff stated he was unaware of the statement, did not know why the statement would be on the website, and whoever included that information on the website was simply wrong and did not "know what they were talking about." *Id*. at 38-39.

Although the two Delta Hotels currently owned by Uptowner previously were Holiday Inns and Suites that Uptowner owned before they became Delta Hotels, Mr. Midkiff said Uptowner never owned a Holiday Inn in Proctorville, Ohio, or any property for that matter in Ohio, and it does not currently own any Holiday Inns. *Id*. at 41-42, 74-75.

Furthermore, Mr. Midkiff stated that he never heard of Coco View Resort's website designer, Thunder Communications, and he did not know who contracted for its services. *Id*. at 25-26, 40, 51-52. On the other hand, Mr. Midkiff said that he did know he never signed a contract on behalf of Uptowner with Thunder Communication because "Uptowner Inns does not operate [Coco View] resort or own it, and has no reason to contract for anything for it." *Id.* at 52. Mr. Midkiff further said his wife or his son Wade "would provide information if it [is] needed to be modified for the website." *Id.* at 64.

Additionally, it is undisputed in this case that Mr. Campbell did not make his reservation through Roatan Travel. Rather, he booked his trip through Caradonna Dive Adventures (Caradonna), which is an independent, wholesale travel agency that handles diving reservations all over the world. *Id.* at 20, 46-47; *see also Reservations for Pl.*, ECF No. 36-7. Mr. Midkiff stated he has no affiliation with Caradonna and there is no contract between Caradonna and Roatan to sell rooms at the resort. *Id*. at 47. Instead, Caradonna acts in the same way that Priceline.com does, that is, it sells rooms for other companies that have rooms to rent. *Id*. at 48. In this case, Caradonna made all the travel arrangements for Mr. Campbell, including his stay at the resort, his dive packages, and his flight itinerary. *See Caradonna Reservation Arrangements*, ECF No. 36-7.

When questioned about his knowledge of Mr. Campbell's accident, Mr. Midkiff said he did not know anything about it until this lawsuit was filed. *Dep. of Carl Midkiff.* at 32; *see also Def.'s Am. Resps. to Pls.' First Set of Interrogs., Requests for Prod. of Docs., and Requests for Admis.*, Interrogs. Nos. 2 and 4, ECF No. 36-5. At that time, Mr. Midkiff's son Wade told him about it from information he received from Andrea Martin, a volunteer nurse at the resort. *Id.* at 31-33. Mr. Midkiff further asserted that his interest in Uptowner "is really irrelevant" to his knowledge of the accident because he learned of it through his interest in CEM Investments, which is the corporation that actually owns Coco View Resort. *Id.* at 54-55.

To support their claim that Uptowner can be held liable for the accident, Plaintiffs maintain Uptowner and Coco View Resort are intrinsically intertwined companies. As support, Plaintiffs rely upon (1) Coco View's website providing that "Credit Card payments will be listed as Proctorville Holiday Inn/Uptowner Inns, Inc. on your statement," (2) Coco View Resort's website listing Roatan Travel's West Virginia number for reservations, (3) Wade Midkiff and Elizabeth Midkiff ability to provide information for modifications to Coco View Resort's website, (4) pre-paid credit card reservations going through Roatan Travel, (5) Uptowner and Roatan Travel using the same accountant, and (6) Roatan Travel being located in the same building as Uptowner. *Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss*, at 11-12. Plaintiffs also argue the relationship between Uptowner and Coco View Resort is evident because Carl Midkiff is the President of Uptowner and he also owns an interest in CEM Investments, Inc., which is Coco View Resort's parent company. Moreover, Plaintiffs insist the fact Mr. Midkiff learned of the incident from his son Wade, who is the CEO of Uptowner, after Wade received a copy of the medical report from Honduras shows an interrelationship between the companies. *Id.*

In its Reply, Defendant disputes that any of this evidence is sufficient to impose liability upon Uptowner. Defendant does not dispute that Coco View Resort and Roatan Travel have a business relationship, but the fact there is a mere business relationship between two companies is not enough to impute liability. The Court agrees.

Here, it is unrefuted that CEM and Coco View Resort are both Honduran companies and CEM owns all of Coco View Resort's stock. CEM is a privately held company with the shareholders being Mr. Midkiff, Elizabeth Midkiff, and three trusts. It also is not contested that Uptowner is a privately held company with the shareholders being Mr. Midkiff, Elizabeth Midkiff, and two trusts. Thus, the shareholders of the two companies are not precisely the same. Nevertheless, given that Mr. Midkiff and his son Wade, via the trusts, both have interests in Uptowner and CEM, it is unsurprising that Wade was able to find out what happened from a volunteer nurse at Coco View Resort and report back to his father after Uptowner was sued. It is simple commonsense that the Midkiffs would try to find out what happened when Uptowner was hit with this lawsuit. The fact they did so certainly is not sufficient to impose liability upon Uptowner.

Defendant also does not contest that Coco View Resort lists the phone number for Roatan Travel on its website that customers may call to book vacations at the resort. If a customer calls that phone number, the customer speaks with one of Roatan Travel's employees in West Virginia who can assist them in making a reservation. Roatan Travel also processes credit card payments made in the United States for resort reservations, but any credit card payments made directly at the resort are processed through a Honduras bank and not through

Roatan Travel. Moreover, Roatan Travel and the resort use different accountants and maintain separate bank accounts. Furthermore, despite Roatan Travel's ability to make reservations for the resort, it has no mutual employees with the resort, the resort has no employees in West Virginia, and Roatan Travel is not the only travel agency that can make travel arrangements for the resort. In fact, it is undisputed that Mr. Campbell used a completely different travel agency for his arrangements, Caradonna Dive Adventures. Notably, Mr. Campbell never used Roatan Travel, he had no contact or interactions with Roatan Travel, and Plaintiffs have not sued Roatan Travel.

The evidence produced also shows that Roatan Travel and Uptowner maintain a level of corporate formality separating the two companies. Although Uptowner and Roatan Travel use the same accountant as a consultant, the companies have separate bank accounts. Likewise, although Uptowner and Roatan Travel are located in the same building, Mr. Midkiff stated they do not share the same space within that building.

Plaintiffs assert that Coco View Resort's website shows that Uptowner does business as the resort because it alerts credit card customers that "Proctorville Holiday Inn/Uptowner Inns, Inc" will be listed on their billing statements. However, Mr. Midkiff stated this statement simply is inaccurate as Uptowner does not receive any money from Coco View Resort and there is no "Proctorville Holiday Inn" that he is even aware exists. Mr. Midkiff also did not know the website designer the resort used and Uptowner never contracted with it on behalf of the resort. In fact, in Defendant's Request for Admissions, Mr. Campbell admitted that his credit card payment for his stay at the resort was processed through Caradonna, not Uptowner or Roatan Travel. *Pls.' Resps. to Def.'s Request for Admis., Interrogs., and Requests for Prod.*, at

2, ECF No. 36-4. The statement by Mr. Midkiff that his wife and son provide information for modifications to the resort's website does not change the fact that Mr. Campbell's admitted his payment was processed by Caradonna, which corroborates Mr. Midkiff's assertion that the information on the website is inaccurate.

In their First Amended Complaint, Plaintiffs allege in conclusory fashion that Uptowner does business as Coco View Resort. Despite being provided a period of discovery to support this allegation, the Court finds that Plaintiffs have failed to garnish sufficient facts to state a facially plausible claim that Uptowner is doing business as the resort and can be held responsible for Plaintiffs' injuries. As the Supreme Court stated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), although factual allegations in a complaint must be accepted as true for purposes of a motion to dismiss, this tenet does not apply to legal conclusions. 556 U.S. at 678. Here, Plaintiffs' legal conclusion lacks factual support. Therefore, the Court agrees with Uptowner that this action must be dismissed against it.

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **FINDS** it has subject matter jurisdiction over this matter but, nevertheless, **GRANTS** Defendant Uptowner Inns, Inc.'s Renewed Motion to Dismiss as Plaintiffs have failed to allege sufficient facts to support its claim that Uptowner does business as Coco View Resort.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

        ENTER:      October 4, 2023

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE